# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Patricia Dwyer, individually and on behalf of all others similarly situated, | 7:21-cv-05238 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Allbirds, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Allbirds, Inc. ("defendant") manufactures, markets, labels and sells shoes made from wool ("Product").

2.      Consumers are increasingly influenced by the business practices of companies they choose to engage with.

3.      Factors important to consumers include whether a company acts in way that protects the environment, labor practices and animal welfare.

4.      Allbirds' marketing is based on all these factors, which has helped it become worth over one billion dollars.[1]

## I.   Misleading about Carbon Footprint

5.      Allbirds' advertising is replete with eco-friendly phrases, including Sustainability Meets Style Low Carbon Footprint, Environmentally Friendly and Made With Sustainable Wool.

---

[1] Daniel J. Murphy, How Allbirds Built A $1.4 Billion Company With A Sustainable Sneaker April 30, 2020 https://www.privy.com/blog/allbirds; This DTC brand is flying high on sustainable wings; Mary Avant, How Allbirds Created a Sustainable Supply Chain, Sept. 5, 2017, Sourcing Journal.

# Reversing Climate Change Through Better Business

Reducing our environmental impact has been a top priority since day one. But now, we're taking things further. Explore our overall sustainability approach, our progress thus far, and our bold list of commitments for 2025.

**OUR SUSTAINABLE PRACTICES**

6.      Allbirds has purchased advertisements so that it is presented to people who search for "ethically made running shoes."

7.      While Allbirds emphasizes numerous environmental initiatives, one of their most prominent is their focus on the Product's carbon footprint.[2]



8.      "Carbon footprint" is defined by Allbirds as "the kg CO2e emitted to create our

---

[2] Barbara Schneider-Levy, Allbirds Goes Even Greener by Measuring the Carbon Footprint of Its Popular Shoes, Footwear News, Apr. 14, 2020.

products."

9.     According to Allbirds, "the average footprint of our products is 7.6 kg CO2e" or "carbon dioxide equivalent emissions."[3]

10.     Allbirds measures several criteria in its Products' Life Cycle Assessment ("LCA") to arrive at its carbon footprint.

11.     This includes materials, manufacturing, product use, and end of life.

12.     However, according to People for the Ethical Treatment of Animals ("PETA"), "Allbirds' life cycle assessment (LCA) tool currently only measures the carbon footprint of each product, meaning that it doesn't assess any other environmental impact of wool production, including on water, eutrophication, or land occupation."[4]

13.     However, the "Higg Materials Sustainability Index calculates that the carbon footprint of wool accounts for only just over half of wool's total environmental impact."

14.     This means that "Allbirds' LCA is excluding almost half of wool's environmental impact."

15.     Additionally, "Allbirds' LCA tool uses data from several sources, and there are discrepancies in industry-sourced data," which render it unreliable.

16.     Allbirds' figures are based on "the most conservative assumption for each calculation, skewing the calculations in its own favor," so it can make more significant environmental claims.

II.  Misleading Animal Welfare Claims

17.     Allbirds makes numerous claims about the welfare of the sheep which supply the

---

[3] https://www.allbirds.com/pages/sustainability
[4] Allbirds Is All Wrong—Urge It to Ditch Wool NOW! PETA, Apr. 14, 2021.

main component of their Product, wool.

## Our Sheep Live The Good Life

We work with leading organizations like ZQ Merino to ensure our wool is held to high standards of farming, land management and animal welfare.





18.    Allbirds' advertising is centered around sheep in pastoral settings.

19.    One ad states, "What if every time you got a haircut they made shoes out of it? That would be pretty cool."

4



20.     Another ad states, "Behind every shoe is a sheep. And behind every sheep, is another sheep, probably.



21.     Allbirds promotes its "happy" sheep "behind empty welfare policies that do little to stop animal suffering."[5]

22.     If Allbirds were required to either truthfully disclose the practices which provide the wool for its shoes, or if it refrained from representing its "humane" and "animal-friendly" attributes, fewer people would buy the shoes.

23.     Wool "comes from sheep who live horribly and are eventually killed in the wool industry."

24.     Allbirds has claimed that its wool harvesting practices is sustainable, humane and that it intends to eventually source "only wool from 'regenerative' sources."

25.     "Sustainable" is defined as "able to be upheld or defended."[6]

26.     Based on investigations into more than 100 large-scale wool operations, most of which had been promoted in the same terms used by Allbirds – as "sustainable" and "responsible" – "workers beat, stomped on, cut open the skin of, and slit the throats of conscious, struggling sheep."

27.     These practices are neither sustainable or humane.

28.     Though Allbirds' claims that its supplier, ZQ Merino, ensures that "sheep live the good life," this is not feasible when "individual care in such large production numbers has to be almost or absolutely nonexistent."

29.     Allbirds' emphasis on "transparency" is also false, deceptive and misleading, "as it stonewalls any enquiries into its wool sourcing."

30.     Allbirds passes the buck about its wool production to ZQ Merino.

---

[5] *Id*.
[6] Google search, sustainable definition.

6

31.    However, ZQ Marino is not transparent with the standards and practices it utilizes, stating, "The ZQ standard is not online because it's an on-farm manual for our growers, not a consumer facing document."

32.    ZQ Marino's website reveals serious gaps in its ability to ensure that "sheep live the good life."

33.    For instance, it claims to "audit" sheep farms only every three years.

34.    More significantly, their website concedes that "the ZQ programme does not extend to certification beyond the farm gate, though we work with many long-term partners within the supply chain, who align with ZQ values and adhere to our Rules of Engagement agreement."

35.    According to PETA, this means that "slaughter and transportation – during which much abuse occurs – are not necessarily covered under the ZQ certification."

36.    Additionally, this certification permits sheep to "be deprived of food and water for up to 48 hours."

37.    ZQ Merino had "claimed that it only sources from countries with strong animal welfare legislation, but the standard now covers farms in Argentina, Australia, and South Africa, all countries where animal welfare standards are routinely ignored."[7]

38.    PETA also noted that Allbirds' "use of discarded crab shells as 'better for the planet,'" is false, deceptive and misleading.

39.    This is because Allbirds purchases "shells from the Canadian snow crab industry, which is an inherently harmful industry," where "Endangered whales are being caught in snow crab fishing gear, and climate change is threatening the population of snow crabs themselves."

---

[7] Based on the graphic nature of the proven conduct at certain sheep farms, they will not be repeated here but are available at PETA's website.

40.     The Products contains other representations which are false and misleading.

41.     Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes and features of the Product, relative to itself and other comparable products or alternatives.

42.     The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

43.     Defendant sold more of the Product and at a higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

44.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

45.     The Product is sold for a price premium compared to other similar products, an average of $95 per pair for new models, but discounts are available for older models, higher prices than they would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

46.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

47.     Upon information and belief, the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

48.     Plaintiff Patricia Dwyer is a citizen of New York.

49.     Defendant Allbirds, Inc. is a Delaware corporation with a principal place of business in San Francisco, San Francisco County, California

50.     The parties are citizens of different states.

51.     Venue is proper because plaintiff resides in this judicial district, and a substantial

8

part of the events or omissions giving rise to the claims occurred in this judicial district.

Parties

52.  Plaintiff Patricia Dwyer is a citizen of Stony Point, Rockland County, New York.

53.  Defendant Allbirds, Inc., is a Delaware corporation with a principal place of business in San Francisco, California, San Francisco County.

54.  Defendant is a shoe brand built on direct-to-consumer ("D2C") sales.

55.  Defendant's products are sold to consumers through its website, its brick-and-mortar stores, and increasingly, through third-parties, such as Nordstrom.

56.  The average price of the shoes is $95 per pair, but some older products are sold for half this amount.

57.  Defendant is valued at $1.4 billion, based on its most recent funding.

58.  Defendant has raised close to $100 million from deep-pocketed investors.

59.  Plaintiff bought the Product at or exceeding the above-referenced prices, on one or more occasions at one or more locations, including in 2021, from stores including Walmart and from Walmart.com.

60.  Plaintiff relied on the representations identified here, which she observed over the internet.

61.  Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the claims made by Defendant.

62.  The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

63.  Plaintiff intends to, seeks to, and will purchase the Product again when she can do so

with the assurance that Product's representations are consistent with its capabilities and features.

Class Allegations

64.     The class will consist of all New York, residents who purchased the Product during the statutes of limitations for each cause of action alleged.

65.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

66.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

67.     Plaintiff is an adequate representative because her interests do not conflict with other members.

68.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

69.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

70.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

71.     Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

72.     Plaintiff incorporates by reference all preceding paragraphs.

73.     Plaintiff and class members desired to purchase a product which was sustainable and ensured the well-being of the sheep.

74.     Defendant's false and deceptive representations and omissions are material in that

they are likely to influence consumer purchasing decisions.

75.    Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

76.    Plaintiff relied on the representations.

77.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

78.    The Product was manufactured, labeled and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was sustainable and ensured the well-being of the sheep.

79.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

80.    This duty is based on Defendant's outsized role in the market for this type of Product.

81.    Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

82.    Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

83.    The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

84. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

85. Defendant had a duty to truthfully represent the Product, which it breached.

86. This duty is based on defendant's position, holding itself out as having special knowledge and experience this area.

87. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

88. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

89. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

90. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was sustainable and ensured the well-being of the sheep

91. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its composition and qualities.

Unjust Enrichment

92. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

12

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   June 13, 2021

                                             Respectfully submitted,

                                             Sheehan & Associates, P.C.
                                             /s/Spencer Sheehan
                                             60 Cuttermill Rd Ste 409
                                             Great Neck NY 11021-3104
                                             Tel: (516) 268-7080
                                             Fax: (516) 234-7800
                                             spencer@spencersheehan.com