UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PATRICIA DWYER, individually and on behalf of
all others similarly situated,

                                Plaintiff,              **OPINION & ORDER**

    - against -                        No. 21-CV-5238 (CS)

ALLBIRDS, INC.,

                                  Defendant.
-------------------------------------------------------------x

Appearances:

Spencer Sheehan
Sheehan & Associates, P.C.
Great Neck, New York
*Counsel for Plaintiff*

Steven A. Zalesin
Patterson Belknap Webb & Tyler LLP
New York, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court is Defendant's motion to dismiss Plaintiff's Amended Complaint.  (ECF

No. 17.)  For the following reasons, the motion is GRANTED.

## I.    **BACKGROUND**

      For purposes of this motion, the Court accepts as true the facts, but not the conclusions,

alleged by Plaintiff in the Amended Complaint.  (ECF No. 14 ("AC").)

### A.    **Facts**

      Defendant Allbirds, Inc. is a Delaware corporation with its principal place of business in

San Francisco, California.  (AC ¶ 83.)  Defendant manufactures, markets, labels, and sells shoes

made from wool (the "Product"), (*id.* ¶ 1), typically priced at $95 per pair for new models, with

discounts available for older models, (*id.* ¶¶ 75, 86).  Defendant sells the Product through its website and brick-and-mortar stores, and also through third-party vendors.  (*Id.* ¶ 85.)  Plaintiff Patricia Dwyer bought the Product, "on one or more occasions at one or more locations, including in 2021, from stores including Walmart and Walmart.com."  (*Id.* ¶ 89.)

Defendant's advertising focuses on the Product's environmental impact, (*id.* ¶ 5), with representations such as:  "Sustainability Meets Style," "Low Carbon Footprint," "Environmentally Friendly," "Made with Sustainable Wool," "Reversing Climate Change . . . " and "Our Sustainable Practices."  (*Id.* ¶ 6.)  One such example was included in the Amended Complaint:



## Reversing Climate Change Through Better Business

Reducing our environmental impact has been a top priority since day one. But now, we're taking things further. Explore our overall sustainability approach, our progress thus far, and our bold list of commitments for 2025.

**OUR SUSTAINABLE PRACTICES**

(*Id.*)  Defendant uses a life cycle assessment ("LCA") tool to estimate its products' carbon footprint, which it defines as "the kg CO2e emitted to create our products."  (*Id.* ¶¶ 8-9.)[1] Defendant also "measure[s] other greenhouse gases, like methane, and convert[s] them to CO2." (*Id.* ¶ 10.)  Defendant states that the average carbon footprint of its products is 7.6 kg CO2e, (*id.* ¶ 12), and provides – presumably on its website, although the Amended Complaint does not say – individual carbon footprint figures for particular products, breaking down the total CO2e into categories for materials, manufacturing, use and "end of life," with emissions from materials

---

[1] CO2e refers to carbon dioxide equivalent emissions.  (*Id.* ¶ 12.)

accounting for the most significant component.  (*Id.* ¶¶ 13-14.)  The calculation specifies that "Allbirds transportation emissions are calculated separately and our entire footprint is offset to zero."  (*Id.* ¶ 13.)

Plaintiff alleges that Defendant's environmental claims are misleading, (*id.* ¶¶ 5-35), taking issue with Defendant's use of the Higg Material Sustainability Index ("Higg MSI"), a standard developed by the Sustainable Apparel Coalition ("SAC") to measure the environmental impact of apparel materials.  (*Id.* ¶¶ 15-16.)  Plaintiff criticizes the Higg MSI's methodology as addressing only raw materials and lacking standards for comparing different materials, (*id.* ¶¶ 17-18), and alleges that unnamed independent researchers find the Higg MSI to be "unsuitable 'for public disclosure or comparative assertions,'" (*id*. ¶ 19).  The SAC allegedly recognizes these limitations and "is revamping the Higg MSI to incorporate 'product level environmental impacts.'"  (*Id.* ¶ 21.)

Plaintiff also criticizes the LCA tool Defendant uses, (*id.* ¶¶ 22-35), noting that according to People for the Ethical Treatment of Animals ("PETA"), "'Allbirds' [LCA] tool currently only measures the carbon footprint of each product, meaning that it doesn't assess any other environmental impact of wool production, including on water, eutrophication, or land occupation.'"  (*Id.* ¶ 22; ECF No. 19-1 at 2.)[2]  According to Plaintiff, had Defendant calculated the carbon footprint from sheep farming overall – including items such as methane emitted by sheep and runoff of chemicals used in cleaning or pesticides – as opposed to the carbon footprint from its products, the carbon footprint figures would be significantly higher.  (AC ¶¶ 23-34.)

---

[2] Eutrophication is defined in the Amended Complaint as "excessive richness of nutrients in a lake or other body of water, frequently due to runoff from the land, which causes a dense growth of plant life and death of animal life from lack of oxygen."  (AC ¶ 28.)

The LCA tool also allegedly uses data from several sources, and there are unspecified "discrepancies in industry-sourced data," purportedly "render[ing] it unreliable."  (*Id.* ¶ 35.)

Plaintiff also claims Defendant has made misleading animal welfare claims, (*id.* ¶¶ 36-69), including "Our Sheep Live The Good Life," (*id.* ¶ 36).  This statement, which may come from Defendant's website – again, the Amended Complaint does not say – is followed by the representation that Allbirds "work[s] with leading organizations like ZQ Merino to ensure our wool is held to high standards of farming, land management and animal welfare."  (*Id.*) Defendant runs advertisements showing sheep in pastoral settings, (*id.* ¶ 37), with quips such as, "What if every time you got a haircut they made shoes out of it?  That would be pretty cool," (*id.* ¶ 38), and "Behind every shoe is a sheep.  And behind every sheep, is another sheep, probably," (*id.* ¶ 39).  Defendant has claimed – again, it is not clear where – that "its wool harvesting practices [are] sustainable [and] humane," and that it "intends to eventually source 'only wool from "regenerative" sources.'"  (*Id.* ¶ 43.)  Plaintiff alleges these statements are misleading, as "[e]conomic realities dictate – and require – that all sheep bred for wool are also slaughtered and sold for their meat," (*id.* ¶ 41), and that investigations of more than 100 large-scale wool operations have shown that "workers beat, stomped on, cut open the skin of, and slit the throats of conscious, struggling sheep," (*id.* ¶ 45; ECF No. 19-1 at 1).[3]  Plaintiff further notes the existence of a painful procedure performed on sheep to discourage the nesting of parasitic

---

[3] Plaintiff alleges that "most of [the large-scale wool operations inspected] had been promoted in the same terms used by Allbirds – as 'sustainable' and 'responsible.'"  (AC ¶ 45.) But the PETA blog post on which the Amended Complaint bases this allegation and from which it purports to quote says that investigators found the troubling practices at "more than 100 large operations investigators have visited – even so-called 'sustainable' and 'responsible' farms." (ECF 19-1 at 1.)  There is nothing in the post supporting the notion that "most" of the investigated farms were "so-called 'sustainable' and 'responsible' farms."

blowflies on their bodies, (*id.* ¶¶ 47-52), and that sheep are often slaughtered for meat before they would have died naturally, (*id.* ¶¶ 54-57).

Additionally, Plaintiff alleges that Defendant "passes the buck about its wool production to ZQ Merino," (*id.* ¶ 60); that sheep cannot "live the good life" when individual care cannot be provided to sheep raised in large numbers, (*id.* ¶ 53); and that ZQ Merino's certification does not ensure that sheep "live the good life" because ZQ Merino audits farms only every three years, (*id.* ¶ 63), and its website states that its program "does not extend to certification beyond the farm gate, though we work with many long-term partners within the supply chain, who align with ZQ values and adhere to our Rules of Engagement agreement," (*id.* ¶ 64).  This means, according to PETA, that "slaughter and transportation – during which much abuse occurs – are not necessarily covered under the ZQ certification." (*Id.* ¶ 65; ECF No. 19-1 at 2.)  PETA also criticizes Defendant's statement that its use of discarded crab shells is "better for the planet," arguing that the shells come from an "inherently harmful industry" that endangers crabs and whales.  (AC ¶¶ 68-69; ECF No. 19-1 at 2.)

According to Plaintiff, the value of the Product she purchased was materially less than its value as represented by Defendant, (AC ¶ 72), and Defendant sold more of the Product at a higher price than it would have "in the absence of this misconduct," (*id.* ¶ 73).  Had Plaintiff known "the truth," she would have not bought the Product or would have paid less for it.  (*Id.* ¶ 74.)

### B.   **Procedural History**

Plaintiff filed the original complaint in this action on June 13, 2021, (ECF No. 1), and Defendant answered on July 17, 2021, (ECF No. 7).  On the same date, Defendant requested a

5

pre-motion conference in contemplation of a motion to dismiss.  (ECF No. 8.)[4]  At the pre-motion conference on August 11, 2021, the Court granted Plaintiff leave to amend the complaint. (*See* ECF No. 13 at 6:14-22.)  Plaintiff filed the Amended Complaint on August 25, 2021.  (AC.) The Amended Complaint seeks damages and injunctive relief for:  (1) violations of Sections 349 and 350 of the New York General Business Law ("GBL"), which prohibit deceptive business practices and false advertising; (2) breach of express warranty; (3) fraud; and (4) unjust enrichment.  (AC ¶¶ 102-117.)  Plaintiff seeks to represent a class of all persons residing in New York who have purchased the Product.  (*Id.* ¶¶ 94-101.)[5]

## II.    **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (cleaned up).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a

---

[4] Defendant explained in its pre-motion letter that it had concurrently answered and requested a pre-motion conference in connection with its anticipated motion to dismiss, in order to prevent what it described as Plaintiff's counsel's practice of dismissing in one jurisdiction and refiling in another in an effort to forum-shop.  (ECF No. 8 at 1.)

[5] At the August 11, 2021 conference, I divested my interest as a class member.  (ECF No. 13 at 2:16-23.)

prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss under Rule 12(b)(6):

> a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint; mere notice or possession is not enough. And even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it must be clear that there exist no material disputed issues of fact regarding the relevance of the document.

*United States of America ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (cleaned up), *petition for cert. filed*, No. 21-1314 (Apr. 1, 2022). A court may also consider matters "of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991). This includes information on a party's publicly available website, as long as the authenticity of the site is not in dispute, but such information may be considered

only for the fact that it was said, not for its truth.  *Cotiviti, Inc. v. McDonald*, No. 19-CV-6559, 2021 WL 2784529, at *6 (S.D.N.Y. July 2, 2021).

Defendant supplied, as attachments to the Declaration of Steven A. Zalesin in Support of Defendant Allbirds' Motion to Dismiss, (ECF No. 19), a PETA publication, (ECF No. 19-1), and a document from Defendant's website detailing the methodology Defendant uses to calculate the Product's carbon footprint, (ECF No. 19-8).[6]  I will consider the PETA publication because it is integral to the complaint, in that it forms the factual basis for most of the allegations in the Amended Complaint.  Further, Plaintiff does not dispute her reliance on the publication, its authenticity or its relevance.  I also consider the methodology document, the authenticity of which Plaintiff does not dispute, but only for the fact of its contents, not their truth.  I am not considering the remaining exhibits Defendant provided.  (*See* ECF Nos. 19-2 through 19-7, 19-9.)

## III.   DISCUSSION

### A.   New York General Business Law Claims

Plaintiff's first cause of action arises under GBL §§ 349 and 350.  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce," and Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law §§ 349(a), 350.  To state a claim under either section, Plaintiff must show "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."

---

[6] Citations to ECF No. 19-8 refer to the page numbers generated by the Court's electronic filing system.

*Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *6 (S.D.N.Y. Oct. 26, 2016) (cleaned up); *see Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).

"A defendant engages in 'consumer-oriented' activity if [the company's] actions cause any 'consumer injury or harm to the public interest.'" *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  This requirement is liberally construed, *id.*, and "may be satisfied by showing that the conduct at issue potentially affects similarly situated consumers," *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (cleaned up).  Defendant does not contest that its alleged conduct was consumer-oriented.  Plaintiff alleges that Defendant is responsible for "manufactur[ing], market[ing], label[ing], and sell[ing]" the Product, which it sells through its website, brick-and-mortar stores, and third-party sellers, (AC ¶¶ 1, 85), and these allegations suffice to satisfy the first element of Plaintiff's GBL claim, *Brown v. Kerry Inc.*, No. 20-CV-9730, 2021 WL 5446007, at *3 (S.D.N.Y. Nov. 22, 2021), *report and recommendation adopted*, 2022 WL 669880 (S.D.N.Y. Mar. 7, 2022); *see Evergreen E. Coop. v. Bottomley Evergreens & Farms, Inc.*, No. 20-CV-184, 2021 WL 1163799, at *3 (S.D.N.Y. Mar. 26, 2021) (labeling of product for retail sale "plainly consumer-oriented"), *appeal docketed*, No. 21-2827 (2d Cir. Nov. 21, 2021).

New York courts apply an objective standard in determining whether acts or practices are materially deceptive or misleading:  whether the alleged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 178 (2021) (cleaned up); *see Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).  To survive a motion to dismiss, a plaintiff "must do more than plausibly allege that a label might conceivably be

misunderstood by some few consumers." *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409, 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020) (cleaned up).  Rather, a plaintiff must "plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Id.* (cleaned up).  "Although the question of whether a business practice or advertisement is misleading to a reasonable consumer is generally a question of fact, it is 'well settled that a court may determine as a matter of law that an allegedly deceptive [practice] would not have misled a reasonable consumer.'" *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (*per curiam*)).

Plaintiff's allegations in support of her GBL claims are that Defendant markets the Product using false, deceptive, and misleading statements about environmental impact and animal welfare.  (AC ¶¶ 5-74.)  She fails to plausibly allege, however, that the statements to which she points are materially misleading.

## 1.     Environmental Impact Claims

As to the allegedly misleading environmental impact claims, Plaintiff takes issue with Defendant's use of the LCA tool and the Higg MSI, which inform its calculation of the Product's carbon footprint.  (*Id.* ¶¶ 8-19.)  Plaintiff relies on a publication from PETA that states that the LCA tool "currently only measures the carbon footprint of each product, meaning that it doesn't assess any other environmental impact of wool production, including on water, eutrophication, or land occupation." (*Id.* ¶ 22; ECF No. 19-1 at 2.)  But this is a criticism of the tool's methodology, not a description of a false, deceptive, or misleading statement about the Product.[7]

_____

[7] Further, Plaintiff's allegation that the LCA tool purportedly is unreliable because it "uses data from several sources, and there are discrepancies in industry-sourced data," (AC ¶ 35;

Plaintiff does not allege that the calculations Defendant provides are wrong or that Defendant falsely describes the way it undertakes those calculations.  That Plaintiff and PETA believe that Defendant should use a different method of measuring the Product's carbon footprint, (*see* AC ¶¶ 17-19, 21-22; ECF No. 19-1 at 2), does not plausibly suggest that what Defendant in fact says is materially misleading.  "[T]he alleged inadequacy of the standards imposed is not enough to render the statements actionable."  *Lee v. Can. Goose US, Inc.*, No. 20-CV-9809, 2021 WL 2665955, at *6 (S.D.N.Y. June 29, 2021) (dismissing analogous claim under District of Columbia law because although plaintiff "argues that [defendant's] compliance, regulation, and licensing are insufficient and unsatisfactory by some accounts," plaintiff did not allege defendant's statements regarding them were inaccurate).

Plaintiff does not allege that a reasonable consumer would expect Defendant to use another method of calculation or would be misled by Defendant's use of the LCA tool or the Higg MSI.  In advertising the Product's carbon footprint calculations, Defendant describes the exact components of the calculation, (AC ¶ 13), and Plaintiff provides no facts suggesting that Defendant is not calculating the carbon footprint as advertised.  Indeed, Defendant on its website provides consumers with details regarding the LCA tool's methodology and the categories used in its calculation, (*see generally* ECF No. 19-8), never indicating that it includes methane emissions from land occupation or eutrophication,[8] or that it accounts for the entire life-cycle of

---

ECF No. 19-1 at 2), is too vague to plausibly suggest a material misrepresentation.  The Amended Complaint contains no facts regarding what the discrepancies are or how they render the tool unreliable.  "New York courts routinely dismiss GBL claims where the allegations are insufficiently specific to establish a deceptive practice."  *Canestaro v. Raymour & Flanigan Furniture Co.*, 984 N.Y.S.2d 630 (Table), 2013 WL 6985415, at *2 (Sup. Ct. 2013).

[8] Defendant states that it does include methane emissions from the four categories in its calculations (materials, manufacturing, use and end of life) by converting them to carbon dioxide equivalents, (ECF No. 19-8 at 3), and Plaintiff nowhere alleges that it does not do so.

wool production.  Defendant does not mislead the reasonable consumer because it makes clear what *is* included in the carbon footprint calculation, and does not suggest that any factors are included that really are not.  Further, as Defendant argues, (D's Mem. at 13-14), Plaintiff does not allege that a reasonable consumer would expect a carbon footprint calculation for a shoe manufacturer to include non-atmospheric inputs, such as land occupation and eutrophication, or to include carbon generated from the production of raw materials before they come into the manufacturer's hands.  In short, I agree with Defendant, (*id.* at 14), that it is not plausible that a consumer would be misled into thinking that Defendant undertook its carbon-footprint calculation in any manner other than the one it describes in its literature, and Plaintiff has not suggested that Defendant does not in fact do it in that manner.  *See Gomez-Jimenez v. N.Y. L. Sch.*, 956 N.Y.S.2d 54, 59 (App. Div. 2012) ("[A] party does not violate GBL 349 by simply publishing truthful information and allowing consumers to make their own assumptions about the nature of the information.").

Nor does Plaintiff sufficiently allege that Defendant materially misleads a reasonable consumer by relying on the Higg MSI to calculate the CO2e of its materials.  That the Higg MSI's calculation does not go beyond raw materials, and that the number would be higher if it included "the entire lifecycle of wool production," (AC ¶ 34), is, again, simply a critique of its methodology.  "That the relevant standards may . . . be . . . inadequate does not render [Defendant's] representations as to compliance [with those standards] false or misleading."  *Lee*, 2021 WL 2665955, at *6.  There may well be room for improvement in the Higg MSI, (*see* AC ¶ 21), but that does not suggest that reliance on the current standard is deceptive.  Defendant discloses its reliance on the Higg MSI as its data source for measuring the CO2e of its materials, (ECF No. 19-8 at 5), and Plaintiff provides no facts suggesting that a reasonable consumer would

understand a calculation of a material's $CO_2e$ to include the $CO_2e$ generated before the material came into existence or otherwise expect that a more expansive standard be used. *Cf. Gedalia v. Whole Foods Mkt. Servs., Inc*., 53 F. Supp. 3d 943, 955 (S.D. Tex. 2014) (plaintiffs' claims fail under California's "reasonable consumer" standard because they "offer no reason that the reasonable consumer would assume 365 Brands organic products are any more organic than what organic certifying agencies require").

Plaintiff also argues that Defendant improperly omitted information relating to the environmental impact of the wool industry's methane emissions, land occupation, and eutrophication. "[A] plaintiff can only state a claim for omission under the GBL where the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Gordon v. Target Corp*., No. 20-CV-9589, 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022) (cleaned up); *see Yodice v. Touro Coll. & Univ. Sys*., No. 21-CV-2026, 2021 WL 5140058, at *5 (S.D.N.Y. Nov. 4, 2021). Defendant clearly did not alone possess the allegedly omitted information, given that Plaintiff cites to environmental researchers, PETA, the 2017 Pulse of the Fashion Industry Report, "industry sources," and the United Kingdom's House of Commons Environmental Audit Committee as discussing the environmental impact of the wool industry and sheep farming. (*See* AC ¶¶ 19, 22-23, 25, 27); *see Gordon*, 2022 WL 836773, at *11 (plaintiff failed to plausibly allege that defendant improperly omitted information because, according to plaintiff, health experts had been publishing it for years). Plaintiff's belief that "the onus is on Defendant" to not omit this information because "[r]easonable consumers are not likely to know of eutrophication and methane emissions from sheep," (P's Opp. at 10), is insufficient to show Defendant materially misled reasonable consumers, *see Gordon*, 2022 WL 836773, at *11. There is no obligation under GBL § 349 or § 350 to provide whatever

information a consumer might like to know.  *See Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) ("In the case of omissions in particular . . . [§ 349] surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation.").  Further, Defendant's literature states that the "materials" component of its carbon-footprint calculation consists of the $CO_2e$ from the production, extraction, processing, and packaging of raw materials.  (ECF No. 19-8 at 3.)  Plaintiff provides no basis to find it plausible that a reasonable consumer would expect that calculation to include non-atmospheric effects or effects from the farming that precedes the production of the raw materials.

### 2.    Animal Welfare Claims

Plaintiff takes issue with Defendant's marketing scheme that involves depictions of "happy" sheep in "pastoral settings," alleging that they rest on "empty welfare policies that do little to stop animal suffering."  (AC ¶¶ 37, 40.)  But Plaintiff fails to identify any misstatement in any advertisement that would deceive consumers.  She points to two advertisements that show sheep in a field, one of which says, "What if every time you got a haircut they made shoes out of it? That would be pretty cool," and the other of which says, "Behind every shoe is a sheep. And behind every sheep, is another sheep, probably."  (AC ¶¶ 38-39.)  These ads, which are obviously intended to be humorous, make no representations at all.  As Plaintiff concedes, (P's Opp. at 5), Defendant nowhere describes the sheep as "happy."  Instead, Plaintiff criticizes the sheep industry and wool harvesting practices as a whole, (AC ¶¶ 41-42, 45-57), which does "not satisfy Plaintiff's burden to allege that a specific advertisement or statement by Defendant would mislead a reasonable consumer as to the Product."  *Gordon*, 2022 WL 836773, at *10.

Plaintiff also states that Defendant "has claimed that its wool harvesting practices is [*sic*] sustainable, humane and that it intends to eventually source 'only wool from "regenerative" sources.'"  (AC ¶ 43.)[9]  Plaintiff contends this statement is misleading, based on a PETA publication that found cruelty to sheep at over 100 large-scale operations.  (*Id*. ¶ 45; *see* ECF No. 19-1 at 1.)  But Plaintiff pleads nothing related to the wool used by Defendant.  Rather, "Plaintiff seems to take issue with the [wool] industry as a whole."  *Gordon*, 2022 WL 836773, at *10. The underlying evidence on which Plaintiff relies – the PETA posting – does not describe any animal cruelty specific to Defendant or its products, and "allegations that the [wool] industry as a whole deceives consumers do not satisfy Plaintiff's burden to allege that a specific advertisement or statement by Defendant would mislead a reasonable consumer as to the Product."  *Id.*; *see Podpeskar v. Dannon Co., Inc*., No. 16-CV-8478, 2017 WL 6001845, at *4 (S.D.N.Y. Dec. 3, 2017) (claim dismissed where plaintiff alleged little about defendant's specific practices; "[r]ather, her argument is predicated on her own speculation that if the cows that produced the milk that [the defendant] used to make its [product] ate food with GMOs or were fed antibiotics, that their milk is necessarily not natural, nor is the yogurt that is made from it").

---

[9] Plaintiff challenges this alleged statement as concealing that Defendant's sheep are not treated humanely.  (AC ¶ 46-67.)  She does not address the sustainability of Defendant's wool harvesting (except as discussed in the previous section) and does not allege that Defendant did not in fact intend to eventually source its wool as described.  I therefore limit my discussion to the allegation of inhumane treatment.

Plaintiff does allege that "PETA also noted that Allbirds' 'use of discarded crab shells as 'better for the planet,' is false, deceptive, and misleading," (*id.* ¶ 68), because the crab industry is "inherently harmful," (*id.* ¶ 69).  The "inherent harm" comes from endangered whales being caught in crab fishing gear and the effects of climate change on crab populations.  (*Id.*)  These general, industry-wide criticisms of the crab business do not begin to suggest that Defendant recycling the shells is not better for the planet than leaving them as trash.

The allegations here differ from those in *Lee*, where the plaintiff took issue with claims of "ethical, responsible, and sustainable" sourcing of fur used in winter coats.  2021 WL 2665955, at *2.[10]  The *Lee* court found that "[t]hough the allegations [were] thin," the plaintiff had plausibly pleaded that the defendant's statements were misleading to reasonable consumers because, although plaintiff did not explicitly allege that the defendant sourced fur using the problematic methods plaintiff described, the plaintiff did allege that these methods were "used in all Canadian provinces and across the U.S." – from which the defendant sourced its fur – and were "widely used in the U.S. and Canada, including by trappers who abide by the standards cited by" the defendant.  *Id.* at *7.  Respectfully, I am not sure I would have reached the same conclusion, but in any event, no similar allegations, narrowing Defendant's sourcing to regions or companies highly likely to use inhumane methods, appear here.  There are no facts to suggest that the 100 farms at which PETA found troubling practices included ZQ Merino's facilities or those of any other farmers with which Defendant may work.

While Plaintiff does specifically criticize ZQ Merino, Defendant's certified wool supplier, (AC ¶¶ 53, 60-67), none of her criticisms plausibly suggest that the sheep from which ZQ Merino gets its wool are treated cruelly.  Plaintiff alleges that sheep at ZQ-certified farms do not receive individual care, (AC ¶ 53), but no reasonable consumer would expect farm animals to receive such care, and in any event the lack of individual care hardly shows inhumane treatment. Plaintiff further criticizes the methodology ZQ Merino uses to certify its wool, noting that it does not audit its supplying farms as frequently as PETA would like, (*id.* ¶ 63), does not post its

---

[10] Despite drawing similarities between the facts in *Lee* and this case in her pre-motion letter, (*see* ECF No. 11 at 1-2), Plaintiff now appears to agree with Defendant that "the representations made by Defendant [here] are different than those made by [the defendant in *Lee*]."  (P's Opp. at 9.)

standards online, (*id.* ¶ 61), works in countries "where animal welfare standards are routinely ignored," (*id.* ¶ 67), and only certifies the farms themselves, not those involved in the transportation or slaughtering of sheep, (*id.* ¶¶ 64-65).  As with Plaintiff's complaints about the LCA tool and the Higg MSI, these are critiques of the methodology ZQ Merino uses to certify farms, not allegations that inhumane practices occur at those farms, let alone at the particular farms from which Defendant obtains wool.  At most these allegations suggest that a ZQ Merino certification is no guarantee that animals at the farms it certifies could never be treated cruelly, which is not enough to render plausible the allegation that Defendant made a materially misleading statement when it allegedly described its wool harvesting practices as humane.  *See Lee*, 2021 WL 2665955, at *6; *Gordon*, 2022 WL 836773, at *10.[11]

Finally, Plaintiff spends much of the Amended Complaint alleging that Defendant's statement "Our Sheep Live The Good Life" is misleading and deceptive.  (AC ¶¶ 36-58.)  This statement, and the depictions of "happy" sheep in "pastoral settings," (*id.* ¶¶ 37, 40), are classic puffery, which "is not actionable under [§] 349."  *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004).  "Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely."  *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011).  "A subjective claim about a

---

[11] Plaintiff compares the representations in this case to those in *Myers v. Starbucks Corp.*, 536 F. Supp. 3d 657 (C.D. Cal. 2021), where the court found that the plaintiff alleged sufficient facts to show that "because no company, including Starbucks, can claim slave-free chocolate, a reasonable consumer would be misled by chocolate advertised as 'ethically sourced.'"  *Id.* at 665-66 (emphasis omitted) (cleaned up).  Unlike in *Myers*, Plaintiff here has not alleged that "it is difficult or impossible" to produce the Product without the use of problematic practices.  *Id.* at 666.  Instead, Plaintiff relies only on "generalized allegations about industry-wide problems."  *Id.* at 665.

product that cannot be proven either true or false," is not actionable, *Mogull v. Pete & Gerry's Organics, LLC*, No. 21-CV-3521, 2022 WL 602971, at *3 (S.D.N.Y. Feb. 28. 2022) (cleaned up); *see Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) (analyzing puffery in the context of the Lanham Act), nor are "vague and non-specific" statements, *Geffner v. Coca-Cola Co.*, 928 F.3d 198, 200 (2d Cir. 2019) (*per curiam*).

"The Good Life" is a subjective, non-specific, unmeasurable, and vague statement. Plaintiff's tortured effort to distinguish the phrase "better lives," which has been found to be puffery, *see Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) (phrase "'BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU'" was a subjective claim, "which cannot be proven either true or false") (cleaned up), from the phrase "good life" demonstrates the subjective nature of both.  (*See* P's Opp. at 6.)  Like "better lives" and "raised right," *see PETA v. Whole Foods Mkt. Cal., Inc.*, No. 15-CV-4301, 2016 WL 1642577, at *3-4 (N.D. Cal. Apr. 26, 2016) (phrase "Raised Right Tastes Right" is "unspecific and unmeasurable, and therefore constitute[s] puffery"), "the Good Life" is not a phrase that a reasonable consumer would regard as making a factual claim on which she could rely.  "Indeed, such sales talk is considered to be offered and understood as an expression of the seller's opinion only.  The puffing rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific." *Lugones*, 440 F. Supp. 3d at 241 (cleaned up).  "The Good Life" does not specify any fact about the sheep from which Defendant gets its wool, let alone suggest, as Plaintiff alleges, that the sheep receive individual care or do not undergo the blowfly procedure.  (AC ¶¶ 47-53.) Therefore, this statement cannot support a GBL claim.[12]

---

[12] Plaintiff purports to quote *In re Wells Fargo & Co. Sec. Litig.*, No. 20-CV-04494, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021), for the proposition that "qualitative statements can be

Because Defendant's statements, advertisements, and practices relating to the Product are not materially misleading, I dismiss Plaintiff's claims under §§ 349 and 350 of the GBL.

### B.     <u>Plaintiff's Remaining Claims</u>

Plaintiff also brings claims for breach of express warranty, fraud, and unjust enrichment. These claims are all premised on the assertion that Defendant's environmental impact and animal welfare claims are materially misleading. Because I have already determined that Plaintiff fails to allege that the statements, advertising, and practices relating to the Product would be likely to deceive or mislead a reasonable consumer, these causes of action are dismissed for the same reasons. These claims also fail for the independent reason that they are inadequately pleaded.

### 1.     **Breach of Express Warranty**

Plaintiff contends that Defendant breached an express warranty. An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y. U.C.C. Law § 2-313(1)(a). Without specifying any particular language, Plaintiff alleges that Defendant "warranted to [P]laintiff and class members that it was sustainable and ensured the well-being of the sheep." (AC ¶ 108.) But Plaintiff does not specify the statements she alleges to be express affirmations.

---

misrepresentations of existing facts if those statements are belied by conditions known to the defendants." (P's Opp. at 7.) But that language does not appear in the case. *See id.* at *11 ("[L]ike opinion statements, statements of optimism and puffery can be actionable where they contradict facts that are known to a defendant, or where they amount to misrepresentations of existing facts that were made even though the speaker knew that the contrary was true.") (cleaned up). In any event, that case is inapposite, as it analyzes false or misleading statements or omissions, including puffery, in the context of § 10(b) and Rule 10b-5 liability under the Securities Exchange Act of 1934. *See id.* at *10-11. Even assuming the same principles apply under GBL §§ 349-350, the phrase "the Good Life" does not incorporate any representation of existing fact, let alone one Plaintiff has shown was known by Defendant to be false.

Additionally, Plaintiff failed to provide advance notice of the claim to Defendants, as required by N.Y. U.C.C. Law § 2-607(3)(a).  "To assert a breach of warranty claim under New York Law, 'the buyer must within a reasonable amount of time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.'"  *Tomasino v. Estee Lauder Cos.*, 44 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (cleaned up) (quoting N.Y. U.C.C. § 2-607(3)(a)).  "[T]o adequately plead the pre-suit notice requirement, plaintiffs must provide factual allegations – such as the date and method plaintiffs sent a pre-suit notice – supporting the contention that they notified the defendant of the alleged breach within a reasonable time." *Gordon*, 2022 WL 836773, at *14 (cleaned up).

Plaintiff vaguely alleges that "Plaintiff provided or will provide notice to [D]efendant, its agents, representatives, retailers and their employees" and that "Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices since the Product has been sold."  (AC ¶¶ 111-112.)  Identical allegations, in another case filed by Plaintiff's counsel, have been found to be too conclusory and non-specific to adequately plead the required notice.  *See Gordon*, 2022 WL 836773, at *14. Plaintiff argues in her brief that Defendant received "actual notice" from PETA's publications, (P's Opp. at 14) – an allegation that does not appear in the AC – but this contention likewise fails, *see Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 590 (S.D.N.Y. 2021) (allegation that "[d]efendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years," found to be "too conclusory and . . . unsupported by any specific factual allegations"), and would not constitute notice by the buyer in any event, *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 245 (S.D.N.Y. 2021) ("The plain language of N.Y.

U.C.C. § 2-607(3)(a) makes clear that '*the buyer* must notify the seller of breach or be barred from any remedy.'  Therefore, Plaintiff *herself* was required to notify [Defendant] of the alleged breach before bringing the claim herein.") (emphasis in original) (cleaned up).  Although Plaintiff argues that its pleadings may constitute reasonable notice in certain cases, (P's Opp. at 15), this is a minority view, not "a broad rule that a filed complaint qualifies as sufficient and timely notice." *Lugones*, 440 F. Supp. 3d at 244.  Additionally, Plaintiff's contention that the notice requirement does not apply to retail sales does not save her claim; even the cases that adopt that minority view do so only "when a party alleges physical, in addition to economic, injury," *Colpitts*, 527 F. Supp. 3d at 589 (cleaned up), which is not the case here.

Because Plaintiff failed to adequately provide notice to Defendant as required by statute, her breach of express warranty claim is dismissed.[13]

### 2.    Fraud

To state a claim for common law fraud a plaintiff must show that:  "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance."  *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (cleaned up).  Claims of fraud must be pleaded "'with particularity,'" *id.* at 481 (quoting Fed. R. Civ. P. 9(b)), and thus a plaintiff must "(1) detail the

---

[13] Plaintiff also argues that "[t]he express warranty claim also fits into a limited exception to the economic loss doctrine because the parties' close relationship approximates privity," citing *Pilkington NA v. Mitsui Sumitomo Ins. Co.*, 420 F. Supp. 3d 123, 139-40 (S.D.N.Y. 2019), as support.  (P's Opp. at 15.)  But, as discussed in *Pilkington*, this exception to the economic loss doctrine is relevant to negligent misrepresentation claims, *see id.*, not express warranty claims. Nor has Plaintiff "set out facts suggesting that this is the rare case in which a buyer and product manufacturer have a relationship so close as to approach privity of contract." *Chung v. Pure Fishing, Inc.*, No. 20-CV-3983, 2022 WL 866769, at *6 (E.D.N.Y. Mar. 23, 2022).

statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent," *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (cleaned up).  Rule 9(b) also requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (cleaned up).

Apart from the fact that Plaintiff has not pleaded facts rendering plausible the conclusion that the Defendant made a materially false statement or omission, Plaintiff has failed to oppose Defendant's argument that she failed to plausibly plead fraudulent intent.  The fraud claim is therefore dismissed as abandoned.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. R & C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, at *4 (E.D.N.Y. Feb. 7, 2018) (collecting cases for proposition that courts dismiss claims as abandoned where opposition fails to respond to argument for dismissal).  Further, the fraud claim would be dismissed in any event because it fails to plead facts that give rise to a strong inference of fraudulent intent.  The complaint contains only the conclusory allegation that "Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its composition and qualities," (AC ¶ 116), which does not suffice, *see Campbell v. Whole Foods Mkt. Grp. Inc.*, No. 20-CV-1291, 2021 WL 355405, at *12 (S.D.N.Y. Feb. 2, 2021) (dismissing fraud claim where "Plaintiff's only allegation about Defendant's intent is that Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label when it knew this was not true") (cleaned up).

### 3.      Unjust Enrichment Claim

To state a claim for unjust enrichment under New York law, a Plaintiff must show that "(1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) that it would be inequitable to permit the defendant to retain that which is claimed by Plaintiff." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015). "Unjust enrichment is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Mahoney v. Endo Health Sols., Inc.*, No. 15-CV-9841, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (cleaned up).

Courts will routinely dismiss an unjust enrichment claim that "simply duplicates, or replaces, a conventional contract or tort claim." *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013) (cleaned up). "Indeed, courts in the Second Circuit have consistently held that unjust enrichment claims are duplicative of GBL claims." *Barton*, 535 F. Supp. 3d at 249 (collecting cases).

Here, Plaintiff has failed to explain how the unjust enrichment claim is "not merely duplicative of the other causes of action." *Twohig*, 519 F. Supp. 3d at 168 (cleaned up) (collecting cases). Plaintiff's unjust enrichment claim is therefore dismissed.

### C.      Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (cleaned up). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v.*

*City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended once, after having the benefit of a pre-motion letter from Defendant stating the grounds on which it would move to dismiss, (ECF No. 8), as well as the Court's observations during the pre-motion conference, (ECF No. 13 at 6:14-8:22).  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (cleaned up).

Further, Plaintiff has not asked to amend again or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to

amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.[14]  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 17), and close the case.


**SO ORDERED.**

Dated: April 18, 2022
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[14] Based on this disposition, the Court need not evaluate the parties' arguments regarding whether Plaintiff has standing to pursue injunctive relief .